United States Court of Appeals
Fifth Circuit

**F I L E D**

July 7, 2003

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

**No. 02-50656**

_____

**In The Matter Of: LARRY WILLIAMS;
SHANNON BRITTON WILLIAMS**


**Debtors**

**LARRY WILLIAMS**

**Appellant**

**-vs-**

**INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS
LOCAL 520**

**Appellee**

Appeal from the United States District Court
for the Western District of Texas

Before DeMOSS and STEWART, Circuit Judges, and LITTLE[*], District Judge.

LITTLE, District Judge:

This appeal centers upon the interpretation of Section 523(a)(6) of the Bankruptcy Code. That provision states, "A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The issues to be determined are whether this provision

_____

[*] District Judge of the Western District of Louisiana, sitting by designation.

excepts from discharge debts arising out of a knowing breach of contract and whether the actions of the appellant, which include violating a collective bargaining agreement and an Agreed Final Judgment and Decree, caused willful and malicious injury. The district court held that the debts resulted from willful and malicious injury and were nondischargeable under Section 523(a)(6). For the reasons that follow, we AFFIRM in part and REVERSE in part.

## I.

This appeal arises out of the bankruptcy filing of the Appellant-Debtor Larry Williams ("Williams"). Williams is an independent electrical contractor in Texas. He initially operated his electrical contracting business as an "open shop" that employed non-union electricians. Apparently because of this practice, Williams's business was targeted by the Appellee-Creditor, International Brotherhood of Electrical Workers Local 520 ("the Union"). Union members applied to work for Williams on a large commercial project, known as "the Eckerd project," but deliberately did not inform Williams of their affiliation with the Union. Williams hired these applicants. When work on the Eckerd project was to commence, the electricians revealed their Union membership and requested wage and benefit increases. Williams, who had used non-union wages in calculating the cost of the project, was unable to grant these demanded increases. The Union workers went on strike.[1]

As a result of the strike, Williams was unable to begin working as scheduled on the Eckerd project and encountered difficulty with the project's general contractor. After an unsuccessful attempt to hire non-union electricians, Williams entered a collective bargaining agreement ("CBA")

---

[1] Williams was the target of "salting" by the Union. Salting, as described in Williams's brief, is accomplished when Union workers conceal their Union membership, apply for non-union jobs, and then demand union-level compensation from the employer.

2

with the Union, which had promised to provide the necessary employees for the Eckerd project. Under Article III, Section 2 of the CBA, Williams agreed to use the Union hiring hall as "the sole and exclusive source of referral of applicants for employment."   After having additional problems with the Union electricians, however, Williams hired non-union electricians to complete the Eckerd project.[2]  Williams hired these electricians instead of following the grievance procedures outlined in the CBA.  The Union then initiated a grievance against Williams.  After a hearing before the Labor Management Committee, Williams was found to have violated Article III, Section 2 of the CBA.

The dispute between Williams and the Union was resolved when the parties entered an Agreed Final Judgment and Decree which was approved by the United States District Court for the Western District of Texas on 14 December 1999.  Under the Agreed Judgment, Williams was obligated to hire electricians for commercial projects exclusively through the Union.  In addition, the district court ordered an audit of Williams's books and records to determine past compliance with the CBA.  Upon a finding of non-compliance, Williams was ordered to pay restitution of wages and benefits to Union members denied employment and the Union's attorney's fees.[3]

Williams planned to perform only non-commercial projects as a means of subverting the CBA, but a decline in residential construction projects threatened to shut down Williams's business.  In violation of the Agreed Judgment, Williams performed two commercial projects for which he hired non-union electricians.  The Union filed a complaint for monetary and injunctive relief with the district

---

[2]The record indicates that at least one of the workers hired through the Union was discovered sleeping at the construction site.  Williams also alleges that on one occasion, Union electricians absented the construction site and spent an afternoon at a topless bar.

[3]It appears from statements by Williams's attorney in the record that this initial award of attorney's fees was paid.

court. In a Judgment dated 25 April 2000, the district court found Williams had willfully and purposefully violated the Agreed Judgment and held him in contempt of court. Based upon the results of the audit it had requested, the court ordered Williams to pay $155,855.39 as restitution for his original breach of the CBA. The court ordered a second audit to determine the amount of restitution Williams owed for ongoing non-compliance with the Agreed Judgment from 1 December 1999 through 19 April 2000. This amount totaled $106,911.43. The court also awarded the Union attorney's fees for prosecuting the contempt action.

A few weeks after the district court issued its judgment, Williams and his wife filed a petition for relief under Chapter 13 of the Bankruptcy Code. In the bankruptcy proceedings, Williams challenged the accuracy of the two audits conducted by the Union. On appeal, it was determined that Williams was precluded from relitigating in bankruptcy the accuracy of the first audit ordered by the district court and that Williams had forfeited his right to challenge the accuracy of the second audit by refusing to cooperate with auditors. See Williams v. International Brotherhood of Electrical Workers Local 520 (In re Williams), 289 F.3d 458, 460 (5th Cir. 2002). The underlying nature of the debts for purposes of Section 523(a)(6) was not addressed in this prior proceeding. See Archer v. Warner, ___ U.S. ___, 123 S.Ct. 1462, 71 U.S.L.W. 4249, 4251 (2003) (explaining that the underlying nature of a debt is not intended to be determined in a proceeding in which "nondischargeability concerns are not directly in issue and neither party has a full incentive to litigate them." (citation omitted)).

The Williamses converted their Chapter 13 petition to a Chapter 7 petition on 1 June 2001, and an Order of Discharge was entered. The Union filed a complaint with the bankruptcy court seeking to have the two debts from the CBA violations excepted from discharge under 11 U.S.C. §

4

523(a)(6). In a Judgment dated 19 February 2002, the United States Bankruptcy Court for the Western District of Texas, Austin Division, held that the Union's unsecured claims in the amounts of $155,855.39, representing the restitution ordered for the first CBA violation, and $106,911.43, representing damages for Williams's violation of the Agreed Judgment, were excepted from discharge. The court held these debts arose from willful and malicious injury. The bankruptcy court further excepted from discharge the attorney's fees awarded by the district court in its 25 April 2000 order.

On 20 May 2002, the district court affirmed the bankruptcy court's decision in an Order and Final Judgment. Williams timely filed notice of appeal to the United States Court of Appeals for the Fifth Circuit on 10 June 2002. We have jurisdiction under 28 U.S.C. § 158(d).

## II.

We review the bankruptcy court's findings of fact for clear error and conclusions of law *de novo*. Hickman v. Texas (In re Hickman), 260 F.3d 400, 401 (5th Cir. 2001) (citing In re Mercer, 246 F.3d 391, 402 (5th Cir. 2001)). The interpretation of Section 523(a)(6) is a question of law and is reviewed *de novo*. See id. (applying the *de novo* standard of review to the interpretation of Section 523(a)(7)). The bankruptcy court's findings of fact may be reversed only if the reviewing court has "'the definite and firm conviction that a mistake has been made.'" Cotten v. Deasy, 2002 WL 31114061 *2 (N.D. Tex. 2002) (citing Matter of Allison, 960 F.2d 481, 483 (5th Cir. 1992)).

The United States Supreme Court has established guidelines for determining whether a debt arises from a willful and malicious injury and, therefore, is excepted from discharge under Section 523(a)(6). See Kawaauhau v. Geiger, 523 U.S. 57, 59, 118 S.Ct. 974, 975-76, 140 L. Ed. 2d 90 (1998) (holding that Section 523(a)(6) does not except from discharge debts arising from negligently

or recklessly inflicted injuries). In Kawaauhau, the Court examined the language of Section 523(a)(6) and concluded the provision applies to "acts done with the actual intent to cause injury," but excludes intentional acts that cause injury. Id. at 61, 118 S.Ct. at 977. "Willful," as used in the provision, "modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." Id. The Court also noted that the language of Section 523(a)(6) mirrors the definition of an intentional tort, which requires an actor to "intend *'the consequences of an act,' not simply 'the act itself.'"* Id. at 61-62, 118 S.Ct. at 977 (citing Restatement (Second) of Torts § 8A, cmt. a (1964) and adding emphasis).

Applying the Supreme Court's pronouncement that Section 523(a)(6) requires actual intent to cause injury, the Fifth Circuit has held that for a debt to be nondischargeable, a debtor must have acted with "objective substantial certainty or subjective motive" to inflict injury. Miller v. J. D. Abrams, Inc. (In re Miller), 156 F.3d 598, 603 (5th Cir. 1998). Despite similarities in the language used to describe an injury under Section 523(a)(6) and intentional torts, Section 523(a)(6) creates a narrower category of tortious conduct. Id. at 604 (noting, "Merely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful.").

Turning to the meaning of "malicious," the Miller court concluded Section 523(a)(6) creates an "implied malice standard." Id. at 605. A debtor acts with implied malice when he acts "with the actual intent to cause injury." Id. at 606 (citation omitted). This definition of implied malice is identical to the Kawaauhau Court's explanation of a willful injury. Id. (citing Kawaauhau, 533 U.S. at 61-62, 118 S.Ct. at 977). The test for willful and malicious injury under Section 523(a)(6), thus, is condensed into a single inquiry of whether there exists "either an objective substantial certainty of harm or a subjective motive to cause harm" on the part of the debtor. Id. See also Texas v. Walker,

6

142 F.3d 813, 823 (5th Cir. 1998) (stating "'for willfulness and malice to prevent discharge under Section 523(a)(6), the debtor must have intended the actual injury that resulted . . . . 'Intent to injure may be established by showing that the debtor intentionally took action that necessarily caused, or was substantially certain to cause, the injury.'" (citing In re Delaney, 97 F.3d 800, 802 (5th Cir. 1996)).

The Kawaauhau Court rejected a broader construction of Section 523(a)(6) that would make debts from intentional acts that cause unintended or unanticipated injuries nondischargeable in bankruptcy. Id. at 62, 118 S.Ct. 977. Such an interpretation would be contrary to the notion that exceptions to discharge "'should be confined to those plainly expressed.'" Id. (citing Gleason v. Thaw, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915)). As an example of an intentional act resulting in unintended or unanticipated injury, the Court cited a knowing breach of contract. Id. With this brief mention of a knowing breach of contract, the Kawaauhau opinion seems to reject the proposition that a debt arising from a knowing breach of contract is a willful and malicious injury excepted from discharge.

The holdings in Kawaauhau, Miller, and Walker indicate that a debtor must commit an intentional or substantially certain injury in order to be deprived of a discharge. A debt is not excepted from discharge if the debtor has committed a willful or knowing act. The dischargeability of Williams's two debts to the Union, therefore, depends upon the intentional or certain nature of the injury Williams inflicted upon the Union when he breached the CBA and defied the Agreed Judgment.

7

III.

Williams seizes upon the reference to a knowing breach of contract in <u>Kawaauhau</u> and urges this court to adopt a construction of Section 523(a)(6) that would render nondischargeable only contractual debts accompanied by separate tortious conduct. Because the debts resulted from breaches of the Union contract, Williams contends the debts are not within the scope of Section 523(a)(6) and should be discharged. The Union posits that the Fifth Circuit's application of <u>Kawaauhau</u> compels a finding of nondischargeability because Williams was substantially certain that his failure to abide by the CBA and the Agreed Judgment would cause injury.

The Fifth Circuit has acknowledged that a breach of contract may involve an intentional or substantially certain injury. <u>See</u> <u>Walker</u>, 142 F.3d at 823 (1998); <u>Miller</u>, 156 F.3d at 606. In <u>Walker</u>, the debtor committed the tort of conversion by keeping professional fees instead of remitting them to his employer, the University of Texas, in violation of his employment contract. <u>Walker</u>, 142 F.3d at 824. The court found that Section 523(a)(6) did not prevent discharge of the debt. The record did not show that the debtor, who admitted his acts were intentional, understood his contractual obligations and knowingly retained professional fees with the intent of depriving his employer of revenue. <u>Id.</u> The <u>Walker</u> court did note, "[i]f a factfinder were to decide that [the debtor] knew of his obligations under the . . . contract . . . then [a factfinder] might also find that [the debtor] knowingly retained his professional fees in violation of the [contract], an act which he knew would necessarily cause the University's injury. This, in turn, could result in a finding of 'willful and malicious injury.'" <u>Id.</u> Maintaining the distinction between an injury under Section 523(a)(6) and an intentional tort, the <u>Walker</u> opinion did not find a willful and malicious injury was inflicted by the

8

debtor's conversion of professional fees. Rather, <u>Walker</u> suggests that a knowing breach of a clear contractual obligation that is certain to cause injury may prevent discharge under Section 523(a)(6), regardless of the existence of separate tortious conduct.

Assessing the dischargeability of another employment-related debt, the Fifth Circuit held that a debtor who misappropriated proprietary information and misused trade secrets could be precluded from obtaining a discharge under Section 523(a)(6) if the debtor's "actions were at least substantially certain to result in injury" to his employer. <u>Miller</u>, 156 F.3d at 601, 606. Although the debtor's actions constituted larceny *per se* and were excepted from discharge by Section 523(a)(4), the court remanded the case for a determination of the debtor's intent or objective certainty to cause injury. <u>Id.</u> at 606. Like <u>Walker</u>, the <u>Miller</u> decision suggests that the dischargeability of contractual debts under Section 523(a)(6) depends upon the knowledge and intent of the debtor at the time of the breach, rather than whether conduct is classified as a tort or falls within another statutory exception to discharge.

Accepting that Section 523(a)(6) excepts contractual debts from discharge when those debts result from an intentional or substantially certain injury, our inquiry now focuses upon the nature of the injury Williams inflicted upon the Union. The record reflects that when Williams hired non-union electricians in violation of the CBA, he was motivated by a desire to complete the Eckerd project and to save his business. Although Williams acted intentionally, he did not intend to injure the Union.

Whether Williams's knowing breach of the CBA was substantially certain to injure the Union is a more difficult call. At oral argument, counsel for the Union suggested that Williams was substantially certain of three types of injury: injury to the Union electricians who were deprived of employment, injury to the non-union electricians who were paid at a lower, non-union rate while

9

working for Williams, and injury to the Union's prestige and its ability to enforce its contracts. The record also indicates that Williams discontinued making payments to the Union pension and vacation funds when he stopped using Union electricians in the fall of 1999. Of these alleged injuries, only one was actually sustained by the Union itself. The deprivation of employment opportunities and the failure to contribute to Union pension and vacation funds affected individual Union electricians. None of the affected Union electricians, however, is a party to this suit. The payment of below-Union-scale wages affected electricians without any connection to the Union; the Union cannot assert any injury the non-union electricians sustained. The only direct injuries to the Union were to its prestige and to its ability to uphold its contracts.

There is no indication in the record that Williams, by breaching the CBA, was substantially certain the Union would sustain a blow to its prestige and its ability to uphold its contracts. Williams did know Union electricians would be deprived of employment opportunities and concomitant salaries and benefits if he hired non-union workers for the Eckerd and other commercial projects. Although this injury was substantially certain to occur, it was not inflicted upon the Union.

To the extent that the debts to the Union were determined to be nondischargeable as substantially certain injuries arising from violations of the CBA, we reverse the district court. Although previous decisions by this circuit hold that injuries resulting from a knowing breach of contract may be nondischargeable under Section 523(a)(6), those decisions also require explicit evidence that a debtor's breach was intended or substantially certain to cause the injury to the creditor. There has been no showing of an intentional or substantially certain injury to the Union.

The issue of Williams's violation of the Agreed Judgment and its treatment under Section 523(a)(6) remains.

10

IV.

Each party attempts to characterize Williams's debts to the Union in a different manner. Williams argues that because all of the damages were based upon violations of the CBA, both debts should be considered contract damages. The Union, conversely, maintains that both debts should be characterized as damages arising from the violation of the Agreed Judgment. The characterization of the debts as resulting from breaches of the CBA or of the Agreed Judgment affects dischargeability under Section 523(a)(6).

In its Judgment dated 25 April 2000, the district court found that Williams had purposefully and willfully violated the Agreed Judgment of 14 December 1999. At the contempt hearing, Williams admitted that he had notice of the Agreed Judgment and that it was clear and unambiguous, that he had continued to use non-union electricians on commercial projects, and that he had not yet paid the restitution for his earlier breach of the CBA. The district court found Williams in contempt and imposed sanctions, which included attorney's fees and additional restitution. A second audit was performed for the period between the entry of the Agreed Judgment in December of 1999 and the contempt hearing in April of 2000. This audit revealed Union electricians had been deprived of $106,911.43 in wages and benefits when Williams hired non-union workers. From the record, it appears that the attorney's fees incurred in the contempt hearing are included in this figure.

At the discharge hearing, the bankruptcy court stated that the $106,911.43 constituted damages from a willful and malicious injury. This amount was assessed against Williams for failing to abide by the Agreed Judgment. The bankruptcy court found that Williams had clearly violated Section 523(a)(6) when he broke his promise to the district court to comply with the CBA. The fact that this promise had been made by Williams to the district court and was sanctioned by the Agreed

11

Judgment and Decree elevated the injury to a willful and malicious level. As a sanction for contempt of the district court's order, the $106,911.43 was determined to be excepted from discharge.

Other bankruptcy courts have held that a contempt judgment against a debtor in bankruptcy is immune from discharge under Section 523(a)(6). Failure to obey a court order constitutes willful and malicious conduct, and a judgment against a defiant debtor is excepted from discharge. PRP Wine Internat'l v. Allison (In re Allison), 176 B.R. 60, 64 (Bankr. S.D. Florida 1994) (denying discharge to a debtor who continued to breach a non-competition clause in an employment agreement after a state court issued a temporary injunction). Another bankruptcy court has explained:

> . . . [W]hen a court of the United States . . . issues an injunction or other protective order telling a specific individual what actions will cross the line into injury to others, then damages resulting from an intentional violation of that order as is proven either in the Bankruptcy Court or, so long as there was a full and fair opportunity to litigate the questions of volition and violation, in the issuing court are *ipso facto* the result of a "willful and malicious injury."
> This is because what is "just" or "unjust" conduct as between the parties has been defined by the court . . . . An intentional violation of the order is necessarily without "just cause or excuse" and cannot be viewed as not having the intention to cause the very harm to the protected persons that order was designed to prevent.

Buffalo Gyn Womenservices, Inc. v. Behn (In re Behn), 242 B.R. 229, 238 (Bankr. W.D. N.Y. 1999).

While the Behn opinion deals specifically with the violation of an injunction, the Agreed Judgment entered by the district court served a similar purpose of protecting the Union from further breaches of the CBA. See id. at 238-39. The Agreed Judgment clearly and unambiguously informed Williams that the use of non-union electricians on commercial projects was forbidden. Williams knew of his obligations under the CBA, yet he knowingly violated those obligations. Even if Williams did not intend to injure the Union, the Agreed Judgment made him substantially certain that his acts

12

would inflict injury. The bankruptcy court properly found that Williams's violation of the Agreed Judgment resulted in a willful and malicious injury.

Williams's argument advocating discharge of the damages for contempt overlooks the fact that the $106,911.43 assessed by the district court arose from Williams's defiance of the Agreed Final Judgment and Decree. Williams's breach of the CBA after the entry of the Agreed Judgment is not simply a failure to honor a contractual obligation; this breach is also a violation of a court's order. Contempt may be characterized as an act resulting in intentional injury. As such, the debt incurred from the violation of the Agreed Judgment is nondischargeable under Section 523(a)(6).

The Union takes the position on appeal that the initial debt of $155,855.39 stems from the contempt order and also should be excepted from discharge. The bankruptcy court held otherwise. The $155,855.39 represents damages that preceded the entry of the Agreed Judgment. The bankruptcy court declined to find that this debt constituted damages resulting from Williams's violation of the district court's order. Instead, the bankruptcy court determined that the initial debt resulted from the violation of the CBA and that there was no evidence that Williams intended to violate a court order at the time this debt was incurred. The conclusion of the bankruptcy court is not clearly erroneous. We agree that the initial debt arising from the breach of the CBA does not qualify as a willful and malicious injury under Section 523(a)(6) and is therefore dischargeable.

V.

The bankruptcy court's factual finding that the debts of $155,855.39 and $106,911.43 stem from two different injuries supports the conclusion that these two debts must be treated differently under Section 523(a)(6). Because there is no indication that Williams intended or was substantially

13

certain to injure the Union when he initially violated the CBA, we hold that the first debt of $155,855.39 does not arise from a willful and malicious injury; Section 523(a)(6) does not except this debt from discharge. We hold, furthermore, the second debt of $106,911.43 arises from the willful and malicious injury Williams inflicted by refusing to obey the Agreed Judgment and is excepted from discharge under Section 523(a)(6).

Accordingly, the decision of the district court is REVERSED in part and AFFIRMED in part.

CARL E. STEWART, Circuit Judge, concurring in part, dissenting in part:

One of the pivotal questions before the Court is whether the debt incurred by Williams in the amount of $155,855.39 as a result of his breach of the collective bargaining agreement is nondischargeable under 11 U.S.C. § 523(a)(6). The bankruptcy judge held that the debt was nondischargeable because it resulted from willful and malicious injury. The majority reverses that determination, finding that the debt is subject to discharge because it does not arise from a willful and malicious injury. For the following reasons, I concur in part and dissent in part with respect to the majority's determination.[4]   Prior to determining whether Williams's breach of the collective bargaining agreement resulted from willful and malicious conduct, the majority was faced with the question of whether a knowing breach of contract, unaccompanied by an independent intentional tort, falls within the exception to discharge under § 523(a)(6). The majority held that a debt arising out a knowing breach of contract is subject to exception to discharge under §523(a)(6) when the debt results from an intentional or substantially certain injury. I concur in the majority's holding, which, in my view flows naturally from the language of § 523(a)(6) and this Court's interpretation of the statute.

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." In Kawaauhau v. Geiger, the Supreme Court held that a "willful and malicious injury" results from an act done with the actual intent to cause

_____

[4]I also concur in the majority's determination that the debt arising from Williams's violation of the Agreed Judgment in the amount of $106,911.43 is nondischargeable.

15

injury.[5] 523 U.S. 57, 61 (1998).  In <u>Texas v. Walker</u>, we stated that an "intent to injure may be established by a showing that the debtor intentionally took action that necessarily caused, or was substantially certain to cause, the injury." 142 F.3d 813, 823 (5th Cir. 1998) (quoting <u>In re Delaney</u>, 97 F.3d 800, 802 (5th Cir. 1996)).  Thus, if a debtor acts with an actual intent to cause injury, the debt is nondischargeable under § 523(a)(6), notwithstanding that the underlying indebtedness may have derived from a contractual relationship between the parties.

I agree with the majority that the inquiry for determining whether a debt is excepted from discharge should focus on the nature of the conduct – whether the debt arose out a willful and malicious injury - and not on whether the conduct is accompanied by an independent tort.[6]  This Court's decision in <u>Walker</u> supports this view. In <u>Walker</u>, the State of Texas brought suit against a university professor for conversion and breach of contract alleging that he improperly retained professional fees in violation of his contract with the university. Although the defendant admitted that

---

[5]In <u>Geiger</u>, the Supreme Court, in determining the scope of the willful and malicious injury exception,  noted that the § 523(a)(6) "formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from reckless torts." 523 U.S. at 61. The Supreme Court further noted that 'intentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'" <u>Id</u>. at 61-62. The Supreme Court rejected the petitioner's encompassing interpretation of § 523(a)(6) that would make debts from intentional acts that cause unintended or unanticipated injuries nondischargeable in bankruptcy. <u>Id</u>. The Supreme Court cited "a knowing breach of contract" as  an example of conduct that would fall within this category.  Thus, section 523(a)(6) has been interpreted as generally applying to intentional torts and not to contracts.

[6]I should note that this conclusion  has been rejected by the Ninth Circuit. In <u>In re Riso</u>, a pre-<u>Geiger</u> decision, the Ninth Circuit h eld that "a simple breach of contract is not the type of injury addressed by § 523(a)(6)" and that "an intentional breach of contract is excepted from discharge under § 523(a)(6) only when it is accompanied by malicious and willful *tortious* conduct." 978 F.2d 1151, 1154 (9th Cir. 1992) (emphasis added).  In <u>In re Jerich</u>, a post-<u>Geiger</u> decision,  the Ninth Circuit again held that "although § 523(a)(6) generally applies to torts rather than to contracts and an intentional breach of contract generally will not give rise to a nondischargeable debt, where an intentional breach of contract is accompanied by *tortious* conduct which results in willful and malicious injury, the resulting debt is excepted from discharge under § 523(a)(6)." 238 F.3d 1202, 1205 (9th Cir. 2001) (emphasis added). In <u>In re Colcazier</u>, the Bankruptcy Court for the Western District of Oklahoma also held that  that § 523(a)(6) exempts from discharge only damages from *tortious* breaches of contract. 134 B.R. 29, 33 (Bankr. W.D.Okl. 1991) (emphasis added).

16

he acted intentionally when he kept the professional fees, the district court determined that the fees were dischargeable under § 523(a)(6) because it found that "Walker's retention of his professional fees was an innocent and technical act, rather than a willful and malicious injury." 142 F.3d at 824. This Court reversed the district court's determination because it found that an "issue of fact exists regarding whether Walker was aware of his obligations under the contract and nonetheless knowingly kept his professional fees with the intent of depriving the University of money owed to it." Id. The Court remanded the case with the following instruction: "If a fact finder were to decide that Walker knew of his obligations under the [] contract and its by-laws, either at the time he signed the contract or received the November 1990 memorandum, then it might also find that Walker retained his professional fees in violation of the [contract], an act he knew would cause the University injury." Id. In Walker, this Court focused on the willful and malicious nature of the university professor's conduct in breaching his contract with the university. Thus, in line with Walker and the plain language of the statute, I concur in the majority's holding that § 523(a)(6) excepts contractual debts from discharge when those debts result from an intentional or substantially certain injury.

I respectfully dissent, however, from the majority's conclusion that Williams's intentional breach of the collective bargaining agreement was not substantially certain to cause injury to the Union. The bankruptcy judge found that by breaching the collective bargaining agreement, Williams was substantially certain that he would deprive union electricians of employment opportunities and concomitant benefits. Specifically, the bankruptcy judge stated that "it's clear through his testimony, Mr. Williams took the action in the fall of '98 of simply deciding to ignore the contract and not calling the Union hall any more and to use non-Union workers to finish the Union jobs in violation of his contract . . . and he did so at a time in which he knew that doing so would deprive Union workers

17

of jobs and benefits and that he knew that would be an injury." It should be noted that neither party contests the bankruptcy judge's factual findings. In fact, Williams's counsel specifically conceded during oral argument that he did not disagree with the bankruptcy judge's factual findings regarding the injury to the Union. Moreover, Williams's testimony is proof that he was substantially certain that injury would result from his breach of the collective bargaining agreement:

> Q. . . .by not contacting the Union hall, you knew that electricians would, therefore, not have the opportunity - - - electricians from the Union Hall would not have the opportunity to work for you.
> A. True.
> Q. Now, when you ceased - - when you decided to cease following the Union contract, you also ceased paying the Union scale. Isn't that true?
> A. Yes.
> Q. And you unilaterally set a lower wage scale for most of your hands. Correct?
> A. Yes, back to the open shop scale.
> Q. All right. And approximately, on the average, how much lower was the wage scale that you began paying when you ceased using the Union contract?
> A. Maybe 10 to 12 an hour.
> Q. All right. And the Union - - under the Union contract, the wage scale for a journeyman was around 20 an hour, wasn't it?
> A. Yes, sir.
> Q. And so the electricians that worked for you after you ceased honoring the Union contract were being paid by you 10 to $12 an hour instead of approximately $20 an hour as is called for in the Union contract.
> A. Yes . . .
> Q. Okay. So I want to understand your question. When you stopped following the Union contract you also ceased contributing to the Union pension fund, didn't you?
> A. I had paid everything in as per the agreement while I was using the Union workers.
> Q. All right.
> A. After that it all ceased, yes.
> Q. You ceased paying - - all right. And so you knew that - - when you ceased using the Union contract and you ceased paying into the Union pension plan you knew that the workers who were working for you

18

would not be accruing any pension benefits under the Union pension plan. You knew that, didn't you?

A.     Yes.

Q.     You also ceased contributing to the Union vacation fund. Correct?

A.     Yes.

Q.     And you knew that the workers would therefore no longer be accruing any benefits under that.

A.     Yes.

In my view, the bankruptcy judge's factual findings determine the resolution of this issue. The majority's attempt to find error in the bankruptcy judge's factual findings by separating the harm suffered by the union-workers from the Union is completely unpersuasive. In this case, Williams breached the collective bargaining agreement that he entered into with the Union; and, by doing so, he was subst antially certain that the Union and its members would be injured. As the bankruptcy judge stated "[Williams] took actions that he knew were wrong, and he knew that there was a substantial certainty that the actions would result in harm to the Union, since he just admitted to the Court that the same thing he had done before that time had [] that effect." Because I conclude that the Union was injured when its members were deprived of employment opportunities and concomitant benefits by Williams hiring of nonunion labor, I would affirm the bankruptcy court's determination that the $155,855.39 was nondischargeable.