[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14939
_____

D.C. Docket No. 3:15-cv-00131-BJD,
Bkcy No. 3:09-bkc-07291-PMG

In Re: JON PHILIP MONSON, II,

Debtor.

_____

JON PHILIP MONSON, II,

Plaintiff-Appellant,

versus

ALFRED GALAZ,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(November 21, 2016)

Before TJOFLAT and HULL, Circuit Judges, and MENDOZA,[*] District Judge.

PER CURIAM:

Appellant Jon Philip Monson, II, (the "Debtor Monson") appeals from a final order of the U.S. District Court for the Middle District of Florida which affirmed the judgment of the Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court").  The Bankruptcy Court determined that $117,950 of the debt that Debtor Monson owes to Appellee Alfred Galaz (the "Claimant Galaz") is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).  After review and oral argument, we affirm.

## I.    BACKGROUND

### A.    The Parties' Agreement and Pre-Bankruptcy Dealings

Claimant Galaz's son is Raul Galaz.  Debtor Monson and Raul Galaz met in federal prison in 2003.  After they were released, Raul Galaz and Debtor Monson discussed partnering for a business venture—opening an Internet café in Hillsborough County, Florida. [1]

On October 11, 2007, Debtor Monson and Creditor Segundo Suenos, LLC ("Creditor Segundo") entered into a Letter Agreement (the "Agreement"), which

---

[*] Honorable Carlos Eduardo Mendoza, United States District Judge, for the Middle District of Florida, sitting by designation.

[1] During the proceedings below, the parties insisted that such cafes are legal enterprises.  The district court pointed out that the cafes typically offer games which have been characterized as "fringe gambling" and "straddle[] the line between permissible and impermissible."

2

provided that Segundo would loan Monson $130,000 for the "funding, creation and management of an internet center" (the "Center"). Claimant Galaz signed on behalf of Segundo.[2]

The Agreement between Debtor Monson and Creditor Segundo provided that the Center would "substantially rely[] on the use of sweepstakes participation in order to market its business." The Agreement stated that Monson's "intent is to form a limited liability company, under the name 'Internet Depot, LLC,' in which [Monson is] the sole member (i.e., owner)." It further provided that Monson would personally manage "all aspects of the Center" on a full-time basis.

In consideration for the loan, Creditor Segundo would receive 40% of the Center's profit after Segundo recouped its loan in full. The Agreement provided that, in the event that the Center was not profitable or the parties otherwise agreed to terminate the business, "all material assets will be liquidated and first used to pay back any unrecouped portion of the loan[.]" To this end, Segundo was "entitled to file . . . any documents necessary to preserve a lien upon all equipment, fixtures, and assets of the Center." Debtor Monson agreed to "execute all documents presented to [him] in order to establish a lien upon such equipment,

---

[2] According to Raul Galaz, Segundo was a "wholly-owned entity" of Claimant Galaz. In addition, Claimant Galaz is listed as the "managing member" of Segundo on Debtor Monson's bankruptcy filing.

After Debtor Monson filed for bankruptcy, Claimant Galaz purchased Segundo's claim against Monson. But because the underlying debt documents refer to Segundo, we refer to "Creditor Segundo" where appropriate throughout this factual background.

fixtures, and assets of the Center[.]"  Additionally, the Agreement provided that "all significant equipment or fixtures" must bear a label "reading words to the affect [sic] of 'Equipment owned by Segundo Suenos, LLC, on lease to Internet Depot, LLC.'"

The Agreement gave Segundo "free access" to all of the Center's records and required Segundo's approval for "[a]ny material decisions relating to the Center," such as the selection of vendors, the hiring of employees, and the signing of contracts.  The Agreement provided that the parties jointly agreed not to open or be involved with "any additional sweepstakes Centers without the consent of the other party" and that, if the parties were to open additional centers, the Agreement's terms would apply.

Debtor Monson used the money he obtained from Creditor Segundo to buy computers, telephones, and other equipment needed to run the Center.  He also oversaw the build-out of the Center's premises, which took three to four months. In February 2008, the Center opened for business.

Raul Galaz testified that Segundo obtained a valid security interest in the equipment, as evidenced by a Florida Uniform Commercial Code Financing Statement Form (a "UCC-1" form).  The UCC-1 form is stamped "FILED" on February 18, 2008, but does not bear any signatures.

On April 21, 2008, law enforcement raided the Center and seized substantially all of its assets, based on allegations that the Center was engaged in illegal online gaming. During this raid, according to Debtor Monson, the equipment was mishandled and damaged. Monson was arrested, but he was never formally charged. In late August or early September of 2008, while the equipment was still in the possession of law enforcement, Debtor Monson received notice that Creditor Segundo wished to terminate its interest in the Center and was demanding liquidation of the Center's assets to repay the loan.[3] On September 12, 2008, Debtor Monson entered into an agreement with law enforcement that permitted Monson to retrieve the seized equipment. As part of this deal with law enforcement, Monson agreed to remove all of the equipment from Hillsborough County, Florida, and further agreed that he would not own, manage, or otherwise be involved in "any type of gambling activities in Hillsborough County [including] . . . computer based sweepstakes games . . . or other computer based game promotions."

---

[3] In its memorandum opinion in this case, the Bankruptcy Court wrote that: "In August of 2008, Segundo wrote a letter to [Monson] claiming that [Monson] had defaulted under the terms of the Letter Agreement, and stating in part:

> For the foregoing reasons, Segundo Suenos hereby demands that all material assets of the Center be liquidated at this time in order to pay back the unrecouped portion of the loan made to you, i.e., $130,000, and Segundo Suenos hereby notifies you of its desire to immediately terminate its interest in the Center.

The Bankruptcy Court cited Plaintiff's Trial Exhibit 35 in support of this evidence, but this exhibit is so poorly copied as to be largely illegible. Raul Galaz, however, read this portion of the letter into evidence at trial. Debtor Monson admitted having received this "Termination Letter" and/or a "Termination Agreement" from Segundo on August 28, 2008.

In October 2008, Debtor Monson and a partner formed a new entity, Southern Investments of Jacksonville, LLC ("Southern Investments") for the purpose of carrying on the business of operating computer sweepstakes games. Monson leased the Center's equipment to Southern Investments, which then used the equipment to open another internet center in Jacksonville, Florida. The lease agreement between Monson and Southern Investments acknowledged that the equipment formerly belonged to Internet Depot and that Segundo "has asserted a lien interest against the subject property which is purportedly secured by a UCC Financing Statement." The Jacksonville internet center opened in February 2009.

Segundo alleged that Debtor Monson "absconded" with the equipment and opened this new business without Segundo's knowledge or consent. Further, according to Raul Galaz, Segundo had no knowledge of the deal Monson struck with law enforcement and had no idea what happened to the assets after they were retrieved from law enforcement, as Monson had simply disappeared and refused to return Galaz's calls or emails.[4]

For his part, Debtor Monson testified that, once he received notice of Segundo's intent to terminate the Agreement, he believed the "entire agreement was over, finished, and done with." He did not think Segundo had a valid security

---

[4] The parties dispute whether Raul Galaz/Segundo had knowledge that Monson had moved, along with the Center's equipment, to Jacksonville. At trial, Debtor Monson admitted that Segundo never gave him permission to use the equipment to set up a new business in Jacksonville.

interest in the equipment because he had no knowledge of the UCC-1 until after his arrest and he never signed any lien documents. He felt that, while Segundo had "claims" to the equipment, both he and other creditors of Internet Depot had claims to it as well. He believed that the equipment belonged to his business, Internet Depot, because it was purchased by Internet Depot. While Monson acknowledged that Segundo loaned him money, he testified that Segundo was "well aware of the fact . . . that this was a high-risk business. We all knew going into this thing we could get shut down. Which unfortunately, in my case, we were open 61 days and we were shut down. They knew the risk going in."

## B.    The Texas State Court Action

On February 18, 2009, Creditor Segundo filed a complaint against Debtor Monson in Texas state court, alleging breach of the Agreement and other state-law claims. On June 16, 2009, Debtor Monson and Creditor Segundo entered into a "Rule 11 Agreement" in the Texas state court case whereby Monson agreed to produce the equipment by July 30, 2009. The last item of that agreement read, "Remedy for Failure: Judgment for full amount of the claim: $130,000." The terms of this agreement were formally entered as an order in the Texas proceeding on August 19, 2009. On February 4, 2010, the Texas court entered an "Order Granting Seizure and Turnover of the Equipment," directing Monson to turn over

certain listed equipment to Segundo by February 16, 2010.[5]  The Texas state court action was removed to federal court and then transferred to the Florida Bankruptcy Court shortly thereafter.

On August 11, 2010, the Bankruptcy Court granted Monson's motion to turn over the equipment to Segundo, and the equipment was shipped to Segundo later that month.[6]  According to an appraisal obtained by Monson, the value of the equipment as of August 1, 2009, was $12,050.

## C.    The Bankruptcy Action

On August 31, 2009, Debtor Monson filed for Chapter 7 bankruptcy.  On December 4, 2009, Creditor Segundo filed an adversary proceeding in Monson's bankruptcy case.

In April 2011, Claimant Galaz purchased Segundo's claim against Monson. On June 2, 2011, the Bankruptcy Court substituted Claimant Galaz and Raul Galaz (the "Galaz Plaintiffs") for Creditor Segundo as plaintiffs in the adversary proceeding.

In July 2011, Claimant Galaz and Raul Galaz, as successors-in-interest to Creditor Segundo, filed a Second Amended Complaint against Debtor Monson.

---

[5] While Segundo claims that the Texas court issued an opinion from the bench on August 21, 2009, directing judgment against Monson, there is no transcript from this hearing and the court's formal order was not entered until February 4, 2010.

[6] According to the trial evidence, a bankruptcy court in Texas immediately seized these assets and sold them to a buyer: Monson.

The complaint raised three counts.  First, the Galaz Plaintiffs alleged that Monson obtained moneys and properties from Segundo by false pretenses, false representation and/or fraud and, thus, these debts were nondischargeable under 11 U.S.C. § 523(a)(2) (Count I).  Second, the Galaz Plaintiffs alleged that: (1) Monson's actions constituted "fraud or defalcation while acting in a fiduciary capacity" (the "fiduciary claim"); and (2) Monson embezzled the Center's assets after the Texas court ordered their return to Segundo and, thus, these debts were nondischargeable under 11 U.S.C. § 523(a)(4) (Count II).  Finally, the Galaz Plaintiffs alleged that Monson maliciously and willfully injured Segundo by "converting the Internet Center Assets for his own personal advantage" and, thus, these debts were nondischargeable under 11 U.S.C. § 523(a)(6) (Count III).

Monson answered, denying the operative allegations in the complaint and asserting eight affirmative defenses.

In July 2012, the Bankruptcy Court dropped Raul Galaz as a named party in the adversary proceeding based on its finding that Raul Galaz no longer had a personal stake in the outcome of the proceeding.  The Bankruptcy Court allowed Claimant Galaz to continue as a named party.

Both Debtor Monson and Claimant Galaz filed motions for summary judgment, which the Bankruptcy Court granted in Monson's favor as to the

9

fiduciary claim but denied in all other respects. On October 23, 2014, the Bankruptcy Court held a one-day bench trial.

On January 9, 2015, the Bankruptcy Court entered its Memorandum Opinion. The Bankruptcy Court explained that, while Creditor Segundo filed the complaint in 2009 to determine the dischargeability of the debt owed by Debtor Monson under the Agreement, the Galaz Plaintiffs were "substituted for Segundo as the plaintiffs" in June 2011, and, as of July 2012, Claimant Galaz was the sole named plaintiff in the action.

Turning to the issue of nondischargeability, the Bankruptcy Court noted that, while the "fundamental purpose of the Bankruptcy Code is to afford financial relief to honest but unfortunate debtors," the exceptions to discharge contained in Section 523(a) of the Code "prevent a debtor from avoiding the consequences of his wrongful conduct by filing a bankruptcy case." The Bankruptcy Court further explained that a creditor objecting to the dischargeability of the debt under § 523(a) bears the burden of proof.

As to Count I, the Bankruptcy Court explained that, to establish a claim under § 523(a)(2)(A), a creditor must show that, at the time the promise was made, the debtor knew that he could not fulfill the promise or had no intention of fulfilling the promise. The Bankruptcy Court determined that the evidence here did not establish "that the Debtor [Monson] intended to deceive Segundo at the

10

time that he signed the Letter Agreement and obtained the loan." The Bankruptcy Court pointed out that Monson performed "a number of his obligations" under the Agreement, including overseeing the construction and management of the Center, and that the Center opened for business four months after the Agreement was signed. The Bankruptcy Court held, however, that the evidence did not establish that Monson withheld the Center's financial information from Segundo, that he took unauthorized draws from the loan proceeds, or that he refused to sign the documents necessary to perfect Segundo's interest in the equipment. Therefore, the Bankruptcy Court held, the evidence did not establish that the debt owed to Claimant Galaz, as successor-in-interest to Creditor Segundo, was nondischargeable as a debt for fraud under § 523(a)(2).

As to Count II, the Bankruptcy Court explained that, to establish a claim under § 523(a)(4) for embezzlement, Claimant Galaz, as successor-in-interest to Creditor Segundo, must show that Segundo owned the property that was taken and that Monson took it with fraudulent intent. The Bankruptcy Court determined that the evidence did not establish embezzlement for two reasons. First, the evidence demonstrated that Monson believed that Internet Depot owned the equipment and that no valid security agreement was ever signed, the financing statement was deficient, and Segundo's security interest was therefore invalid. Second, the evidence did not establish that Segundo was the owner of the Center's equipment

11

or that Monson ever believed that Segundo held a valid security interest in the equipment after it was retrieved from law enforcement. Thus, the Bankruptcy Court held that the evidence did not establish that the debt owed to Claimant Galaz, as successor-in-interest to Creditor Segundo, was nondischargeable under § 523(a)(4).

As to Count III, dealing with nondischargeability under § 523(a)(6) for "willful and malicious injury," the Bankruptcy Court first wrote that "a debtor must commit some type of intentional tort directed against the claimant or his property" for a debt to be nondischargeable. Further, the injury must be both "willful, meaning that the injury itself was intended, and malicious, meaning that the debtor was conscious of his wrongdoing." The Bankruptcy Court determined that the evidence showed that Debtor Monson "knew that he damaged Segundo's right to recover its loan when he removed the Center's assets from Hillsborough County to Jacksonville, Florida, and used the assets in a new business created with a new business partner."

In reaching this conclusion, the Bankruptcy Court relied on specific record facts, which it summarized as follows:

> (1) [Monson] received a $130,000.00 personal loan from Segundo to open the Center; (2) [Monson] agreed to liquidate the Center's assets to repay Segundo if the Center was not profitable; (3) [Monson] knew that Segundo intended to enforce its right to repayment of the loan from the Center's assets; (4) within two months after Segundo asserted its right to repayment from the Center's assets, [Monson]

12

entered into an agreement with a new partner to open an internet center in a different location using the Center's assets; and (5) [Monson] actually opened the new business without notifying Segundo that the Center's equipment had been relocated.

In sum, the Bankruptcy Court found that Debtor Monson's conduct constituted a willful and malicious injury to Creditor Segundo within the meaning of § 523(a)(6) because Monson injured Segundo's right to recover its loan, the injury was intended, and Monson was conscious of his wrongdoing. Thus, the debt was nondischargeable under § 523(a)(6).

The Bankruptcy Court then proceeded to calculate the amount of the nondischargeable debt as the original loan amount of $130,000, less the value of the equipment that was returned to Segundo in 2010, yielding a total figure of $117,950. The Bankruptcy Court wrote that it reached this conclusion for two reasons. First, it was consistent with the purpose of § 523(a), which is to prevent debtors from avoiding the consequences of their wrongful conduct. In such situations, the Bankruptcy Court determined, it was appropriate for all debts arising from the willful or malicious act to be nondischargeable and that "excepting punitive damages from discharge under § 523(a)(6) is not inconsistent with the Bankruptcy Code's 'fresh start' policy[.]" Second, the Bankruptcy Court determined that Monson had "stipulated in a separate state court action that the amount of the damages for his failure to return the equipment to Segundo was

13

$130,000." In support, the Bankruptcy Court pointed to the June 16, 2009 Rule 11 Agreement that the parties signed in the Texas state court action.

Thus, in its Final Judgment, the Bankruptcy Court entered judgment in favor of Debtor Monson on Counts I and II, concluding that "the debt owed by the Debtor [Monson] to Alfred Galaz is not nondischargeable pursuant to § 523(a)(2) or § 523(a)(4) of the Bankruptcy Code." As to Count III of the complaint, the Bankruptcy Court entered judgment "in favor of the Plaintiff, Alfred Galaz, and against the Debtor [Monson]," and directed that $117,950 of the debt was nondischargeable under § 523(a)(6) of the Bankruptcy Code.

## D.    District Court Proceedings

Debtor Monson appealed the Bankruptcy Court's order to the district court, arguing that the Bankruptcy Court erred in deciding that he committed a willful and malicious injury under § 523(a)(6). Claimant Galaz, as successor-in-interest to Creditor Segundo, cross-appealed, arguing that Monson did in fact commit fraud and embezzlement, as defined in 11 U.S.C. § 523(a)(2) and (a)(4), and that the Bankruptcy Court erred in ruling that Monson did not.

The district court held that the Bankruptcy Court's factual findings as to the § 523(a)(2) and (a)(4) counts were not clearly erroneous. Turning to the § 523(a)(6) count, the district court pointed out that Monson did not challenge the Bankruptcy Court's enunciated factual findings with respect to § 523(a), and it

14

concluded that these findings were "well-supported" by the record. Thus, the district court did not revisit these factual findings, but limited its review to whether "the pertinent willful and malicious acts are the type contemplated by § 523(a)(6) to render a debt nondischargeable."

The district court held that, while the Bankruptcy Court erred in finding that tortious conduct is a necessary prerequisite for a finding of nondischargeability under the section, such conduct is "certainly one avenue available to a bankruptcy court in establishing nondischargeability." And while the Bankruptcy Court did not enunciate which tort it relied on in reaching its conclusion, the district court held that, in any event, "Monson's actions injured Segundo because those actions deprived Segundo of access to the collateral, and such injury was substantially likely to occur."[7]

The district court rejected Monson's argument that his actions were an "efficient breach of the contract" under 11 U.S.C. § 365(a) because § 365(a) requires court approval, which Monson did not show here. The district court also approved of the damages amount calculated by the Bankruptcy Court, writing that case law supported a punitive damages award and that the Bankruptcy Court

---

[7] In support, the district court cited In re Garcia, 442 B.R. 848 (Bankr. M.D. Fla. 2011), and In re Giffen, 195 B.R. 951 (Bankr. M.D. Fla. 1996), which stand for the proposition that the sale of "collateral" without notice to the "lienholder" gives rise to an exception to discharge under § 523(a)(6). The district court wrote that it was "aware" of the Bankruptcy Court's finding that Monson believed Segundo's security interest was not valid, but that the validity of the interest did not change its analysis.

15

properly considered the parties' stipulated damages amount of $130,000.

Therefore, the district court affirmed the Bankruptcy Court's Opinion and Final

Judgment.

Monson, alone, has appealed the district court's determination to this Court.

## II.    STANDARD OF REVIEW

We review a bankruptcy court's findings of fact for clear error. In re Kane,

755 F.3d 1285, 1288 (11th Cir. 2014). Where the district court has affirmed the

bankruptcy court's findings, we apply this clearly erroneous standard with

"particular rigor." Id. We review conclusions of law, whether from the

bankruptcy court or the district court, de novo. In re Jennings, 670 F.3d 1329,

1332 (11th Cir. 2012). Because a bankruptcy court's determination that an injury

was "willful and malicious" is a factual finding, "on appeal, we review de novo

any legal interpretation of the terms 'willful' and 'malicious,' but we review only

for clear error the bankruptcy court's finding that a creditor showed a willful and

malicious injury by a preponderance of the evidence." Kane, 755 F.3d at 1293.

## III.    DISCUSSION

### A.    Section 523(a)(6)

"A Chapter 7 debtor is generally entitled to a discharge of all debts that

arose prior to the filing of the bankruptcy petition. But this 'fresh start' policy is

only available to the 'honest but unfortunate debtor.'" Kane, 755 F.3d at 1292

16

(citation omitted).  To this end, Congress enacted several exceptions to the general rule of discharge.  Id.  One of those exceptions is contained in § 523(a)(6), which excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).

This Court has explained that a debtor commits a "willful" injury when "he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury."  Kane, 755 F.3d at 1293 (quoting Jennings, 670 F.3d at 1334); see also Kawaauhau v. Geiger, 523 U.S. 57, 61–62, 118 S. Ct. 974, 977 (1998) (holding that § 523(a)(6) requires the actor to intend the injury, not just the act that leads to the injury).  We have determined that "malicious" means "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will."  Jennings, 670 F.3d at 1334 (quotation marks and citation omitted).  For the purposes of § 523(a)(6), "malice can be implied."  Kane, 755 F.3d at 1294 (internal brackets, quotation marks, and citation omitted).  "Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice."  In re Ikner, 883 F.2d 986, 991 (11th Cir. 1989).

Here, the Bankruptcy Court's factual determinations are well supported by the record evidence.  The Bankruptcy Court did not err in finding that Claimant Galaz, as successor-in-interest to Creditor Segundo, showed, by a preponderance

17

of the evidence, that Monson committed a willful and malicious injury within the meaning of § 523(a)(6).  See Kane, 755 F.3d at 1293.

## B.    Willful Injury

Monson committed a willful injury because his action of absconding with the Center's equipment and using it to open a new internet center was an "intentional act the purpose of which [was] to cause injury or which [was] substantially certain to cause injury."  Kane, 755 F.3d at 1293.

Monson argues that applying this tort-like standard to breaches of contract would "dramatically expand the number of nondischargeable debts and diminish the scope of the bankruptcy discharge" and advocates that "tort or tort like actions" are required for nondischargeability under § 523(a)(6).  We have previously considered and rejected this argument.  See id. at 1295-96 (rejecting the debtor's argument that § 523(a)(6) requires an independent and additional showing of an "intentional, tortious act" because (1) the statute contains no language calling for an independent showing of tortious conduct, and (2) neither this Court nor the Supreme Court has ever "introduced any such requirement").  In doing so, we cited a case from the Fifth Circuit holding that a "knowing breach of a clear contractual obligation that is certain to cause injury may prevent discharge under Section 523(a)(6), regardless of separate tortious conduct."  Id. at 1295-96 (citing  In re

Williams, 337 F.3d 504, 510 (5th Cir. 2003)).[8]  The Fifth Circuit in Williams

explained that "the dischargeability of contractual debts under Section 523(a)(6)

depends upon the knowledge and intent of the debtor at the time of the breach,

rather than whether conduct is classified as a tort[.]"  337 F.3d at 510.

Here, Monson received a Termination Letter and/or a Termination

Agreement from Segundo in late August or early September of 2008 that notified

him of Segundo's intention to terminate the Agreement and demanded that he

return the Center's assets or immediate liquidate them in order to repay the

$130,000 loan.  Yet within just a few months, Monson used the Center's

equipment to open a new internet center with a different partner in another part of

Florida.  While there is conflicting evidence about whether Monson kept Segundo

informed of his new venture in Jacksonville, it is undisputed that Monson knew

Segundo was asserting its right to repayment of the loan and that Segundo never

sanctioned the new internet center in Jacksonville.

Further, although the parties hotly contest whether Segundo ever perfected

its security interest in the equipment and/or whether Monson was aware of such an

interest at the time the Center launched, Monson admits that he became aware of at

least a "purported" security interest after his arrest in April 2008.  The evidence is

---

[8] Further, as did the district court, we readily reject Monson's argument that our reading of
§ 523(a)(6) conflicts with 11 U.S.C. § 365(a), which allows a trustee to assume or reject a
debtor's executory contract "subject to the court's approval," because there was no such approval
here.  See 11 U.S.C. § 365(a).

also undisputed that, knowing of Segundo's purported security interest, Monson nevertheless retrieved the equipment, relocated it to a different part of the state, and used it to open a new business, all without notice to, or permission from, Segundo.   Bankruptcy courts within this Circuit have held that, whether or not a lienholder's security interest is properly perfected or recorded, where the debtor has knowledge of the lienholder's claim and subsequently sells or disposes of the property at issue without notice to the lienholder, that act constitutes a willful and malicious injury under § 523(a)(6).  See In re Garcia, 442 B.R. 848, 851-52 (Bankr. M.D. Fla. 2011); In re Giffen, 195 B.R. 951, 953-54 (Bankr. M.D. Fla. 1996).

Thus, Monson knew that his actions were at least substantially certain to cause injury to Segundo's ability to seek repayment of its loan.[9]

---

[9] As we recently noted, our sister Circuits are split as to whether the "substantially certain" prong of the standard requires a subjective or objective standard.  Kane, 755 F.3d at 1293.  However, as in Kane, we need not address this issue here because even under the more stringent subjective standard, the evidence supports the Bankruptcy Court's finding that Monson intentionally committed an act that he knew was substantially certain to injure Segundo.  See id. Moreover, in light of Kane, the Bankruptcy Court was incorrect that an "intentional tort" is required for nondischargeability under § 523(a)(6).  See id.  Rather, all that is required is that Monson's behavior was "willful" and "malicious," which the Bankruptcy Court found.  Thus, the Bankruptcy Court actually imposed a higher standard than what our case law requires, and it still determined that his actions met that standard.

## C.    Malicious Injury

Monson also committed a malicious injury because the injury was wrongful, without just cause, and excessive.  See Jennings, 670 F.3d at 1334.  The very nature of Monson's actions implies a malefic intent.  See Ikner, 883 F.2d at 991.

First, the Bankruptcy Court was free to imply malice because a preponderance of the evidence suggests that Monson's acts were "wrongful and without just cause."  Kane, 755 F.3d at 1294-95.  Monson consented in October 2007 to the provision in the Agreement that entitled Segundo to repayment of its loan from a liquidation of the Center's assets, he knew that Segundo was attempting to terminate that Agreement and recoup the loan, and he nevertheless relocated the equipment to another county and used it in a newly-formed business without Segundo's permission.  While Monson stated at trial that he thought Internet Depot was the rightful owner of the equipment, and that Segundo's claims were "questionable," he admitted that he knew that the loan to Segundo was outstanding and he appropriated the equipment anyway.

Monson makes various excuses for his behavior, including: (1) Segundo knew what they were entering into a high-risk venture, and so once their business got closed down by law enforcement, the Agreement between them became null and void; (2) other creditors had claims or potential claims against the equipment; (3) Segundo never owned or had a valid security interest in the equipment;

21

(4) Segundo did not assist Monson in retrieving the equipment from law enforcement; and (5) Segundo did not adequately protect its collateral.[10]  But these excuses do not make Monson's own conduct any less willful or malicious.  The collapse of the business did not relieve Monson of the contractual obligations which he entered into or give him carte blanche to make off with equipment he bought with someone else's money.   Demonstrably, Monson knew his actions were wrongful and without just cause.

Further, Monson's behavior falls outside of the sort of reckless or unfortunate but non-malicious acts that this Court have previously held do not rise to the standard of a willful and malicious injury under § 523(a)(6).  See In re Walker, 48 F.3d 1161, 1163-65 (11th Cir. 1995) (holding that the debtor's knowing act of failing to obtain workers' compensation insurance, so that the employer owed an employee a debt after the employee suffered a workplace injury, was not the sort of "willful and malicious injury" required for nondischargeability

---

[10] Monson's reliance on our decision in In re Wolfson, 56 F.3d 52 (11th Cir. 1995) (holding that a secured creditor's failure to take reasonable steps to protect its collateral prevented application of § 523(a)(6)'s exception to discharge), is misplaced.  In Wolfson, two brothers ran a horse farm (the "Farm") and pledged various interests in horses as collateral on loans.  56 F.3d at 53.  Five of those loans went into foreclosure, but during this time, the Farm routinely deposited its income, including proceeds from the sale of collateralized horses, into its general business account and it paid the lender whatever it could on the loans on a monthly basis.  Id.  The lender not only was aware of and failed to object to this practice, it continued to extend credit to the Farm.  Id. at 54-55.  This Court concluded that the lender had failed to assert its rights as to the disposition of the collateral and, thus, had waived its right to assert that its claim was nondischargeable under § 523(a)(6).  Id. at 55.  This case is distinguishable because Segundo never acquiesced in Monson's use of the assets to open another business and the record contains at least some evidence that, after the seizure, Segundo took steps to protect its interests by notifying law enforcement of its interest in the property.

under § 523(a)(6) because "it cannot not be said that [the employer] intended for [the employee] to suffer a fall or that there was an unbroken chain of events leading from [the employer's] intentional act to [the employee's] physical injury"); Ikner, 883 F.2d at 987-91 (affirming the bankruptcy court's determination that a judgment in favor of plaintiffs, resulting from an automobile accident, was dischargeable in bankruptcy because "the appellants did not prove by inference or innuendo that [the defendant] intended to cause the accident or resulting injury"); see also Kawaauhau, 523 U.S. at 61-64, 118 S. Ct. at 977 (holding that a debt arising from a medical malpractice judgment, which was attributable to a doctor's negligent or reckless conduct, did not fall within the "willful and malicious injury" exception to discharge).

Finally, a preponderance of the evidence suggests that Monson's acts were "excessive" because it is undisputed that he retrieved all of the seized equipment from law enforcement and that he used at least "some" of it to open the new internet center in Jacksonville.[11]  Thus, we conclude that Monson's actions

---

[11] Monson argues, for the first time on appeal, that his possession of the equipment was not malicious within the meaning of the statute given the "totality of the circumstances," including his "[l]egal excuse and mitigating circumstances."  Generally, we will not address issues that were not raised before the bankruptcy court. See In re Worldwide Web Sys., Inc., 328 F.3d 1291, 1300 (11th Cir. 2003).  Furthermore, none of the "changed business and contract circumstances" cited by Monson in his brief change our analysis.

23

constituted a willful and malicious injury and, thus, the debt is nondischargeable under § 523(a)(6).[12]

## IV.   CONCLUSION

For the foregoing reasons, we affirm the district court's order affirming the Bankruptcy Court's determination that $117,950 of the debt Monson owes to Claimant Galaz is nondischargeable under § 523(a)(6).

**AFFIRMED.**

---

[12] As for Monson's affirmative defenses, he has pointed us to no evidence to support these defenses.  Finally, we conclude Monson has shown no reversible error in the district court's award of $117,950 in damages.

24