Judge Katharine M. Samson, United States Bankruptcy Judge
These two adversary proceedings came on for joint trial on substantively identical Complaints by Plaintiff/Creditor Citizens Bank ("the Bank") against Defendants/Debtors Connor Dewayne Freeman ("Connor") and Derek Trace Cooley ("Trace"). These proceedings are within the bankruptcy court's core jurisdiction under 28 U.S.C. § 157(b)(2)(I).
The Bank challenges the dischargeability of debts owed by Connor and Trace on promissory notes for loans ("Loan One" and "Loan Two" or, together, "Loans") secured by farm equipment, trucks, and a trailer. The Loans went into default, and the Bank asserts that the amounts still owed are excepted from each Debtor's chapter 7 discharge under 11 U.S.C. § 523(a)(2)(A) and (a)(6). However, the Bank failed to prove nondischargeability as to either debt or either Debtor.
FINDINGS OF FACT
I. Summary
At the time these events transpired, Connor and Trace were, respectively, twenty-two and twenty-three years old. Connor had completed a two-year agriculture-related degree at a community college and worked full time as a farm hand on his father's farm. Trace's formal education ended with high school. He worked part time on the farm but made his living in the oil fields.
Connor, Trace, and Craig Freeman-Connor's father and Trace's father-in-law-were *843 all makers on Loan One for $ 110,105.00 and Loan Two for $ 105,125.00. Connor and Trace signed the promissory notes and security agreements because Craig implored them to. Both young men believed they would never have to make any of the payments on either Loan, because Craig would make them all. And the loan officer was told that Craig "paid everything," as Trace put it.
Craig is now incarcerated, and neither Connor nor Trace are on speaking terms with him. Neither Connor nor Trace was ever in possession of any of the collateral that was pledged for the Loans and neither got any of the money that was loaned.
The complete story unfolded at trial through documentary evidence and testimony of Connor, Trace, and the Bank's President of Commercial Lending, Douglas Neal. The loan officer directly involved with the Loans, Stan Pickering, no longer works for the Bank and did not testify.
II. Loan One ($ 110,105.00)
On June 3, 2016, Connor, Trace, and Craig executed the promissory note and commercial security agreement for Loan One in one of the Bank's branch locations. Tr. 18:10-12, Trace A.P. ECF No. 23, Connor A.P. ECF No. 21;[1] Bank Ex. Nos. 6, 7, ECF No. 19 at 9-15.[2] Stan Pickering signed the documents for the Bank.
As Connor and Trace testified, the purpose of Loan One was to buy equipment for use on the farm. Tr. 71:3-6; 92:20-22. The borrowers pledged as collateral the seven pieces of equipment being purchased.[3]
The bill of sale, which was prepared by the Bank's loan processors and executed at the branch, conveyed the equipment to all three borrowers. ECF No. 19 at 7; Tr. 18:10-12; Tr. 40:23-25. But in Connor's and Trace's minds, the equipment was intended to be Craig's. Tr. 71:11-15; 91:13-16.
The seller was Thomas McLain, who had his own farming operation but also worked part-time on Craig's farm. Tr. 69:24-70:6. The Bank wrote a $ 110,000.00 check to McLain, with the additional $ 105.00 in loan proceeds going to fees. ECF No. 19 at 8, 28. Connor later heard that McLain cashed the check and gave the money to Craig. Tr. 72:21-73:2. McLain has since died. Tr. 76:13-16.
After the borrowers' default, the Bank was unable to recover its collateral, raising the question at trial of whether the collateral ever actually existed. Connor knew the equipment existed, having seen it, although he did not check the serial numbers. Tr. 70:9-14. Pickering saw cell-phone pictures of the "significant pieces," particularly the John Deere equipment. Tr. 19:18-20:1; 42:13-15. And according to Trace, McLain did indeed own the equipment. Tr. 99:23-24.
*844 Also on the question of whether the collateral existed, deposition testimony by the manager of the local Deere dealership was read into the record at trial. He testified that product identification numbers for the two pieces of Deere equipment on the bill of sale did not conform to Deere's product numbering system, Tr. 111:22-112:21, but couldn't say whether the errors were intentional or inadvertent or who might have made them:
Q: And with these numbers, is it possible that those numbers could have been typed wrong?
A: Could have been. Yes, sir.
Q: Could they have been given to the bank, the wrong numbers, correct?
A: Correct. Correct.
Q: But do you know who made the error?
A: I have no idea.
....
Q: You do not know if it was intentional or not?
A: Correct.
Tr. 116:2-14.
Neither Connor nor Trace knows where the collateral is or what happened to it. Tr. 82:21-83:22; Tr. 101:25-102:12.
III. Loan Two ($ 105,125.00)
On July 1, 2016, exactly four weeks after executing the documents for Loan One, Connor, Trace, and Craig were back at the Bank branch office to sign an application, promissory note and commercial security agreement for Loan Two. Bank Ex. Nos. 10, 11, ECF No. 19 at 20-26. This time, the borrowers pledged a John Deere tractor with front end loader, a trailer,[4] and two dump trucks, Tr. 30:12-16. The purpose of Loan Two was to refinance the trucks and equipment. Tr. 65:6-7.
Connor testified that this collateral existed. Tr. 87:13-15 ("Q: [D]o you actually know if it all actually ever existed? A: Yes, sir, it did exist."). Connor also testified that to his knowledge, Craig owned the collateral. Tr. 82:8-10 ("Q: [W]as it your understanding that your father owned the equipment? A: Yes, sir.") Again, Pickering saw pictures of the "big stuff," meaning at least the Deere tractor. Tr. 56:12-22. Again, the manager of the local Deere dealership testified that the product identification numbers on the Deere equipment did not conform to Deere's product numbering system, Tr. 112:22-114:8, but that he could draw no conclusions from that fact, Tr. 116:2-14.
Ownership of trucks is shown by title. For the trucks, Pickering was presented with open titles signed on the back by the previous owners. Tr. 57:22-25. The Bank retitled the trucks. Tr. 58:1. In whose names they were retitled-whether Connor's, Trace's, Craig's, any two, or all three-is unknown to the Court; the titles are not in evidence.
Of the collateral pledged for Loan Two, only the trucks and the trailer were recovered. Tr. 32:17-21. The Bank sold them and applied the $ 29,000 in proceeds to Loan Two. Tr. 32:22-23; 34:12-13. As for the tractor with front end loader, none of the parties knows where it is or what happened to it. Tr. 61:11-62:14; 82:21-83:22; 101:25-102:12.
IV. Connor's and Trace's Ownership of the Collateral and Intention to Repay
A. Ownership of the Collateral
As to Loan One, both Connor and Trace testified that they had no ownership interest *845 in the collateral pledged. Tr. 71:7-8; 93:25-94:2. But this testimony was credible only as to what Connor and Trace believed, not as to the fact of ownership. Regardless of what they believed, the bill of sale shows they each had an ownership interest in the equipment. ECF No. 19 at 7.
As to Loan Two, Connor and Trace testified that they had no ownership interest in that collateral either. Tr. 70:25-71:2; 72:11-17. Connor understood he could not pledge collateral he did not own. Tr. 74:4-19. Trace may or may not have understood that by signing the commercial security agreement, he was representing to the Bank that he owned the collateral. Compare Tr. 93:20-22, with Tr. 99:19-22.
B. Intention to Repay the Loans
Connor understood that by signing the promissory notes, he was promising to repay the Loans. Tr. 73:16-22. But he did not intend to have to repay them. Tr. 72:3-8 ("[My dad] asked me to help him sign it and he was supposed to pay it and I was just trusting my dad."); Tr. 73:11-12. Trace also understood he was promising to repay the Loans. Tr. 94:8-10. Like Connor, he did not intend to have to repay them. Tr. 94:11-18 ("I didn't think I would have to .... I was told [by Craig Freeman that] Craig would pay everything. He just needed us to sign.").
Both Connor and Trace signed the promissory notes because they believed the Bank would not lend money to Craig alone, based on Craig's pleas for their help. See, e.g., Tr. 105:10-16 ("Q: [W]as [Craig] ever crying when he came to you? A: Yes, sir. Q: And how did that make you feel that he's your father-in-law coming to you crying and begging you to sign these loans with him? A: Kind of made me feel obligated to help.")
If Connor and Trace had told the Bank they had no intention of repaying, the Bank would not have made the Loans. Tr. 22:18-19, 26:13-19. Although there is no evidence that Craig told Pickering that only he would be making the payments, Tr. 101:1-3, Trace credibly testified that Craig told Pickering that "he was the one that paid everything," Tr. 94:19-21. Pickering not having been present at trial, Trace's testimony stands unrefuted.
V. The Bank's Underwriting
The Bank's underwriting-the process by which it decided to make the Loans-purportedly analyzed four risk indicators: credit reports for past credit history, tax returns for repayment ability, collateral value for loan security, and UCC filings to check for liens on collateral not subject to state title laws. Tr. 15:4-12; 17:15-19; 18:18-21; 19:3-7. The Bank did not see any red flags for either Loan. Tr. 30:8-11 ("The collateral values were good, repayment ability was satisfactory."). The process did not include verifying any of the borrowers' representations.
A. Loan One
For Loan One, the Bank looked at all four risk indicators.
Credit reports "came back satisfactorily" but showed Craig to be the least creditworthy. Tr. 15:15-18; 17:7-11. Connor and Trace having signed blank loan applications, their credit scores were recorded on Craig's application.[5] ECF No. 19 at 1, 3, 5. The scores were shown as "569, 565, *846 684" with no notation about which score belonged to which applicant.[6] Id. at 1.
According to Neal, tax returns showed that only Trace and Connor had the cash flow to service the debt, payments on which would be $ 6,413.56 quarterly for five years. Tr. 17:19-18:9; ECF No. 19 at 9. The 2015 return for Trace and his wife showed their adjusted gross income (AGI) before taxes and deductions to be $ 96,787.00. Tr. 49:5-8.[7] The 2015 return for Connor and his wife showed their AGI before taxes and deductions to be $ 79,216.00. Connor ECF No. 19-1 at 41.
The collateral value was $ 170,250.00, for a sixty-four percent loan-to-value ratio. Tr. 18:22-25. The Bank checked UCC filings to make sure McLain did not owe any money on the equipment. Tr. 19:3-7.
B. Loan Two
Although Neal testified that the Bank undertook the same four-part investigation before approving the borrowers for Loan Two, Tr. 28:12-14, his testimony was not credible. If the Bank had done nothing but look again at the tax returns it collected a mere month earlier for Loan One, it would have been immediately apparent that there was a $ 101,984.00 difference between Connor's income as shown on his tax return and the income as shown on his application.
The application for Loan Two showed Connor's income as $ 181,200.00. See ECF No. 19 at 18. Neal could not say where that figure came from, only that "[i]t should have come from the tax return." Tr. 65:15-20. It did not. The error is especially egregious given that the application, the promissory note, and the commercial security agreement all bear the same date, meaning the returns should have been reviewed at or around the same time.
The Bank contends that Connor should have told Pickering about the error. Tr.
*847 66:10-14. But the Bank did not present convincing evidence that the salary figure was on the application when Connor signed it. Neal testified that the Bank's practice was to have the application filled out completely-whether by the loan officer, assistant, or borrower-before the customer signs it. Tr. 66:3-9. But Neal had previously testified concerning Loan One that it was the Bank's practice for multiple borrowers to each sign blank applications. Tr. 16:22-17:1. Neal offered no explanation for why the Bank's practice in one context was for a customer to sign a blank application and in another context for the application to be filled in completely.
Connor credibly testified that he did not write in the salary figure and did not see it on the application when he signed it. Tr. 80:7-12. He also credibly testified that he had never made $ 181,000 a year in his life and did not tell the Bank he had. Tr. 80:14-18.
CONCLUSIONS OF LAW
In keeping with bankruptcy's goal of giving debtors a fresh start, courts narrowly construe exceptions to discharge in favor of the debtor. Miller v. J.D. Abrams Inc. (In re Miller) , 156 F.3d 598, 602 (5th Cir. 1998). On objection to the discharge of a specific debt under § 523(a), the creditor must prove each of the required elements by a preponderance of the evidence. Hancock Bank v. Harper (In re Harper) , 475 B.R. 540, 546 (Bankr. S.D. Miss. 2012) (citing Grogan v. Garner , 498 U.S. 279, 287-88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) ). " 'Preponderance' means ... more likely than not." Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II) , 994 F.2d 1160, 1164 (5th Cir. 1993).
I. Under § 523(a)(2)(A), the Bank Did Not Meet Its Burden of Proof as to Either Loan or Either Debtor.
"A discharge ... does not discharge an individual debtor from any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition ...." 11 U.S.C. § 523(a)(2)(A). These three grounds-false pretenses, false representation, and actual fraud-are similar in that each "contemplates frauds involving 'moral turpitude or intentional wrong.' " Allison v. Roberts (In re Allison) , 960 F.2d 481, 483 (5th Cir. 1992) (quoting 3 Collier on Bankruptcy ¶ 523.08 [4] (15th ed. 1989)).
Each ground also requires that the creditor actually relied on the debtor's misrepresentation. See AT & T Universal Card Servs. v. Mercer (In re Mercer) , 246 F.3d 391, 413 (5th Cir. 2001). To prove actual reliance, the creditor must show that the misrepresentation was "a substantial factor" in its decision. Id. (quoting Restatement (Second) of Torts § 546 cmt. b).
Reliance need be only justifiable, as determined by "a subjective inquiry that depends on the particular plaintiff and circumstances." In re Harper , 475 B.R. at 547. Reliance on a misrepresentation is justifiable "unless its falsity is obvious or there are "red flags" indicating such reliance is unwarranted." In re Mercer , 246 F.3d at 418.
The Bank alleged that Connor and Trace procured both Loans by either false pretenses/representations or actual fraud. Pretrial Orders ¶ 6, ECF No. 17 at 6. But the Bank failed to prove the elements required for nondischargeability under either theory.
*848 A. Having Failed to Prove Justifiable Reliance, the Bank Did Not Meet Its Burden of Proof as to Actual Fraud for Either Loan or Either Debtor.
"Actual fraud" is "anything that counts as 'fraud' and is done with wrongful intent," as opposed to "acts of deception ... without the imputation of bad faith or immorality." Husky Int'l Elecs., Inc. v. Ritz , --- U.S. ----, 136 S. Ct. 1581, 1586, 194 L.Ed.2d 655 (2016). Where, as here, the creditor's argument is premised on alleged false representations, actual fraud may be proved by establishing these five elements:
(1) the debtor made the representation; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations.
Selenberg v. Bates (In re Selenberg) , 856 F.3d 393, 398 (5th Cir. 2017).[8] Fraud under § 523(a)(2)(A) will exist "when a debtor makes promises of future action which, at the time they were made , he had no intention of fulfilling." Bank of La. v. Bercier (In re Bercier) , 934 F.2d 689, 692 (5th Cir. 1991), overruled on other grounds as recognized by Husky Int'l Elecs., Inc. v. Ritz (In re Ritz) , 832 F.3d 560, 565 n.3 (5th Cir. 2016).
Here, by signing the promissory notes for Loan One and Loan Two, Connor and Trace represented that they would repay the Loans. The Bank asserts that at the time they signed the notes, Connor and Trace had no intention of repaying the Loans but instead were attempting to induce the Bank to make loans they believed the Bank otherwise would not approve. But even if the Bank is correct as to Connor's and Trace's intent, the Bank did not prove justifiable reliance.
The Bank's reliance was not justifiable as to either Loan because of this red flag: Craig told Pickering that he "paid everything," Tr. 94:19-21. Where the recipient of a misrepresentation "has discovered something which should serve as a warning that he is being deceived ... he is required to make an investigation of his own." In re Mercer , 246 F.3d at 418 (quoting Field v. Mans , 516 U.S. 59, 71-72, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) ). The Bank knew Craig was the least creditworthy of the borrowers and that he did not have the cash flow to service even Loan One. Craig's remark to Pickering that he "paid everything" should have alerted the Bank that it was being deceived, triggering investigation into Connor's and Trace's representations that they intended to pay.
As to Loan Two, reliance was also unjustifiable because of a second red flag: the $ 101,984.00 difference between the AGI on Connor's tax return and his income as shown on the loan application. Such a large discrepancy between the same value in two documents should have triggered further investigation.
*849 The Bank having failed to prove justifiable reliance as to either Loan One or Loan Two, the allegation of nondischargeability based on actual fraud fails as to both Debtors.
B. The Bank Did Not Meet Its Burden of Proof as to False Pretenses/Representation for Either Loan or Either Debtor.
A false pretense or false representation is "(1) a knowing and fraudulent falsehood; (2) describing past or current facts; (3) that was relied upon by the other party." In re Harper, 475 B.R. at 547 (citing In re Mercer , 246 F.3d at 418 ; RecoverEdge L.P. v. Pentecost , 44 F.3d 1284, 1292-93 (5th Cir. 1995) ). Here, by signing the commercial security agreements, Connor and Trace represented that they had an ownership interest in the collateral being pledged.
1. Having Failed to Prove the Existence of a Falsehood, the Bank Did Not Meet Its Burden of Proof as to False Pretenses/Representation for Loan One.
As to Loan One, the representations of ownership interests in the collateral were true. Connor's and Trace's unrefuted testimony establishes that the pledged equipment existed. Pickering saw photos. And the bill of sale shows that Connor and Trace each had an ownership interest. That the bill of sale showed incorrect product identification numbers for two pieces of equipment does not prove otherwise, the Bank having cited no support for an argument that Connor and Trace had a duty to verify the numbers and no evidence that the incorrect numbers were anything other than typographical errors. The Bank having failed to prove a falsehood, the allegation that Connor and Trace obtained Loan One by false pretenses or false representation fails.
2. Having Failed to Prove Actual or Justifiable Reliance, the Bank Did Not Meet Its Burden of Proof as to False Pretenses/Representation for Loan Two.
As to Loan Two, regardless of whether Connor and Trace knowingly misrepresented their ownership of the collateral by signing the commercial security agreement, the Bank did not actually rely on their representations in approving Loan Two.
The Bank attempted to establish that Connor's and Trace's representations of an ownership interest in the collateral were material to the Bank's approval of Loan Two:
Q: As a commercial lender, is an ownership interest material in a borrower's ability to pledge collateral?
A: Citizens Bank requires that the person own the equipment that they pledge as collateral.
Q: Or have an ownership interest?
A: Yes, sir.
Q: So, you could have two people owning a piece of equipment?
A: Yes.
Neal Test., Tr. 27:22-28:6. The Bank reasoned that if Connor and Trace did not have an ownership interest in the collateral, there was no effective pledge. See Tr. 74:15-19.
However, according to Neal, "[t]he purpose of the collateral is to repay, for liquidation in [sic] repayment if the borrower is unable to repay." Id. at 35:18-19. Consequently, if at least one of the borrowers owned the collateral that was pledged, the Bank got what it bargained for-and the Bank presented no evidence that Craig did not own the collateral pledged for Loan Two. The Bank therefore did not show that Connor's and Trace's representations *850 about their ownership interests in the collateral were substantial factors in its decision to approve Loan Two.
As to the trucks, the Bank itself retitled them, so the Bank cannot argue that it relied on any representations Connor and Trace may have made. Further, if the Bank retitled the trucks in Connor's and Trace's names, Connor and Trace did own them. Finally, the Bank recovered the trucks and the trailer and so got what it bargained for as to that collateral.
But even if the Bank did actually rely on Connor's and Trace's representations of an ownership interest in collateral other than the trucks and the trailer, that reliance was not justifiable. Both loans were tainted by Craig's statement that he paid everything, and Loan Two was tainted in addition by the large discrepancy between the income on Connor's application and the income on his tax return. The Bank, having thereby been warned about possible deception related to the promissory note and application, was on notice about possible deception related to other documents. See Tower Credit, Inc., v. Williams (In re Williams) , 431 B.R. 150, 156-57 (Bankr. M.D. La. 2010) ("[The lender's] review of the debtor's loan application should have led it to further questioning about the debtor's living expenses, which in turn would have cast doubt on the veracity of all the information the debtor gave to get the loan.").
The Bank having failed to prove actual and justifiable reliance, the allegation that Connor and Trace obtained Loan Two by false pretenses or false representation fails.
II. Under § 523(a)(6), the Bank Did Not Meet Its Burden of Proof as to Either Loan or Either Debtor.
A debt "for willful and malicious injury by [an individual] debtor to another entity or to the property of another entity" is not dischargeable under chapter 7 of the Bankruptcy Code. See 11 U.S.C. § 523(a)(6). As this Court has previously recognized, the standard for nondischargeability under § 523(a)(6) comprises three elements: "(1) the debtor caused an injury; (2) the injury was incurred by another (or the property of another); and (3) such injury was willful and malicious." Barvié v. Broadus (In re Broadus) , 516 B.R. 378, 391 (Bankr. S.D. Miss. 2014). An injury is "willful and malicious" when the court finds "either an objective substantial certainty of harm or [the debtor's] subjective motive to cause harm." Berry v. Vollbracht (In re Vollbracht) , 276 F. App'x 360, 361 (5th Cir. 2007) (quoting Williams v. IBEW Local 250 (In re Williams) , 337 F.3d 504, 509 (5th Cir. 2003) ).
The Bank alleges that Connor and Trace "sold, transferred or otherwise disposed of" the collateral and that those acts "constitute[d] a willful and malicious injury to the [Bank's] property interests." Compls., ECF No. 1 at 3. But Connor and Trace both testified that they did not know what became of the collateral, and the Bank offered no evidence that they were involved in its disappearance. The Bank having failed to prove the first element of causation, the allegation of nondischargeability under § 523(a)(6) fails as to both Loans and both Debtors.
ORDER
The debts owed by Connor Dewayne Freeman and Derek Trace Cooley to Citizens Bank are therefore ORDERED DISCHARGED .
SO ORDERED.

Docket citations to adversary proceeding number 18-06013-KMS appear as "Trace A.P. ECF No. ___"; docket citations to A.P. No. 18-06014-KMS appear as "Connor A.P. ECF No. ___." Similarly, docket citations to chapter 7 case number 17-52319-KMS appear as "Trace Case ECF No. ___"; docket citations to chapter 7 case number 17-52309-KMS appear as "Connor Case ECF No. ___."

The Bank's exhibits, the Complaints, and the Pretrial Orders appear at the same docket numbers in both adversary proceedings. Accordingly, these citations appear as simply "ECF No. 19" (Bank's exhibits); "ECF No. 1" (Complaints); and "ECF No. 17" (Pretrial Orders).

This collateral was described as "2015 New Holland T4.95 NHH5205430; New Holland TA.75 NHH1005937; 2015 John Deere Megawide Plus Sileage Baler 8004X340080; 2015 John Deere 348 Square Baler 3X991119; 2015 Fella TH540T Tedder D 90537; 2015 Kuhn 700 GMD 0582; 2016 Kuhn SR110 Rake B2742." Commercial Sec. Agreement, ECF No. 19 at 11.

This collateral was described as "2011 John Deere 5083E 4x4 Cab Air Tractor, SN LV5083BABK3405 with 553 John Deere Front End Loader, SN W00553X006771; 2008 Ledwell 25 Ton Pintle Hitch Trailer, SN 1N9X072A821088." Commercial Sec. Agreement, ECF No. 19 at 22.

The Bank did not offer the credit reports into evidence:
Debtors' Couns.: Your Honor, those [credit reports] have not been provided to us. If [Neal]'s going to rely on those, I'd like to see what he's looking at.
Bank Couns.: Well, he can look at them, but we're not making them exhibits. It's just his testimony.
The Court: Well, if he's going to refresh his memory with credit reports, then [Debtors' Counsel] has the opportunity to review them.
Bank Couns.: After I tender the witness, or now, or what?
The Court [to Neal]: Are you looking at credit reports?
The Witness: I mean I can or. I mean I can-we had two credit scores, one was a five-sixty-nine and one was a five-sixty-five.
Debtors' Couns.: Your Honor, he's testifying from these reports.
The Witness: The-
The Court: No. No, they're on-
The Witness: It's on the front of the application.
Tr. 15:20 - 16:13.
Had the credit reports been offered and admitted into evidence, it is inconceivable that Connor's report would not have shown that in June 2016 when the borrowers were applying for Loan One, Connor was already the sole obligor on $ 71,173.35 of debt to buy other farm equipment in 2014 and 2015. See Deere & Co. Loan Contracts, Connor Case ECF Nos. 50-1, 50-2. Connor also became the sole obligor on a $ 73,856.52 loan in February 2016, after the same bank had loaned him, Trace, and Craig $ 50,289.00 less than two months earlier in December 2015. See Community Bank Promissory Notes, Connor Case ECF Nos. 34-2 at 2-3, 34-4 at 2-3. Before making either of those loans, Community Bank loaned Trace $ 16,908,37 in November 2015. See Trace Case ECF No. 53-2 at 2-3. In addition, Trace and Craig signed a note for $ 60,218.00 with yet another bank in April 2016. See First State Bank Promissory Note, Trace Case ECF No. 98 at 3-4.

Credit scores between 500 and 559 are considered "very high risk." Terrence Cain, The Bankruptcy of Refusing to Hire Persons Who Have Filed Bankruptcy , 91 Am. Bankr. L.J. 657, 660 n.14 (2017). Here, two of the scores the Bank deemed satisfactory were, respectively, only six and ten points above the "very high risk" range.

Trace and his wife's 2015 AGI was established only by testimony, their 2015 return having not been offered into evidence. Their 2014 return, which was offered and admitted, showed an AGI of $ 68,534.00. See Trace A.P. ECF No. 19-2.

Under past Fifth Circuit authority, actual fraud under § 523(a)(2)(A) required a representation. See, e.g. Gen. Elec. Capital Corp. v. Acosta (In re Acosta) , 406 F.3d 367, 372 (5th Cir. 2005). More recently, the United States Supreme Court has ruled that actual fraud may be proved without a representation. See Husky , 136 S. Ct. at 1586 ("The term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation."). While recognizing that its prior cases were overruled to the extent they required a representation, the Fifth Circuit Court of Appeals has clarified that "actual fraud can still be proven by showing that the debtor in fact made a false representation." In re Selenberg , 856 F.3d at 398 n.1.